We'll hear argument this afternoon in the GEO Group v. Menocal. Mr. Dray. Mr. Chief Justice, and may it please the Court. The government can act only through agents, either employees or non-employee contractors, and the common law draws no distinction between public servants and private individuals engaged in public service. That makes sense. Contractors following the government's instructions are immune from suit for the same reason government employees are immune. That is, they are doing the sovereign's work. Now, to be sure, their immunity is not the same as the sovereign's. The sovereign is immune from suit unless it has waived its immunity. Its agents are only immune when they satisfy certain conditions. The most familiar example is government employees' qualified immunity. For contractors, the conditions for immunity are most famously articulated in Earsley. Namely, what was done was within the constitutional power of Congress, and the contractor performed in compliance with all federal directions. When those conditions are met, a private party doing the government's work is immune from suit. If, however, a district court concludes as a matter of law that those conditions are unmet, as occurred here, that holding is an appealable collateral order. The Earsley conditions are dispositive of the contractor's asserted immunity and separate from the underlying merits. And because an immunity from suit is at issue, waiting until the end of trial and taking appeal only then is not an adequate alternative. Orders denying contractors immunity therefore fit comfortably within this court's precedent, permitting immediate appeals of any number of other immunities. The court should therefore reverse the Tenth Circuit's dismissal of this appeal. I welcome the court's questions. Could you cite the – show us the language in Earsley that indicates this immunity from suit and also the basis for that? But Earsley was just a – seemed to be – it's a short opinion, but it seems to be more about the fact that there was a takings claim that there was – which had gone to the court of claims, and that certainly that Earsley, the construction company, could not effect a taking. So Earsley itself arises after trial, so the court doesn't have to engage the ability not to endure a suit. Yeah. But drawing on a common law history that includes the Pecata-Yabana, Lamar v. Brown, and Murray's Lessee, the court distills these two conditions. And although it doesn't say immunity, I'll concede that, three years later in Brady, the court says, of course, contractors obtain an immunity in connection with the work they perform for the government. And then in 2019, this court explained in Nick v. Township of Scott that Earsley was correct to recognize an immunity from suit. And so this is a common law immunity case, and the long arc of common law cases, or as the court described it in digital equipment, there is a good pedigree in public law for the asserted immunity. Why isn't Earsley better understood as a defense than an immunity? Yes. Well, the court has consistently said that it's an immunity and an immunity from suit. And the rationales that this court and others have given for it is because of the relationship to the sovereign. So it's not just a — But usually the sovereign can't delegate or give away their immunity. And I thought the immunity really is unique to the sovereign. That's the essence of it. And it can't be sort of handed off to other folks. The sovereign's immunity is unique to the sovereign, the sovereign's unconditional immunity. And that's Campbell Ewald. That's what the court held in Campbell Ewald, rejecting the rather ambitious argument that that contractor was forced to make because they had disobeyed the government's instructions, that that contractor enjoyed the government's embracive immunity, as the court called it. And the court rejected that, as I note, because that's true. Your Honor is absolutely correct. The sovereign doesn't hand off its immunity. But that — there are other immunities, including qualified immunity, that are available to people who perform the government's work. Mr. Dre, when your client claims this yearsly protection, is your client saying, I satisfied the yearsly criteria and that shows that I did nothing wrong? Or is your client saying, I satisfied the yearsly criteria, that means that even though I did something wrong, it was, in fact — you know, I am, in fact, protected from legal consequence? The latter. So, in fact, immunities are only useful when they protect — same thing with defenses. Well, go ahead. Explain to me why it's the latter, because it seems to me that the yearsly criteria suggests that you're saying the former. In other words, when somebody says, look, I did only what the government authorized by way of a lawful authorization, what I'm really saying is, so how could I have done anything wrong? Oh, okay. So consider the Cunningham case from the Fourth Circuit that we cite, which Judge Floyd gives a great exposition of this doctrine. In that case, it's kind of like Campbell-Ewald, except the instruction was essentially violate the TCPA to reach out to people who had not consented to be contacted. That instruction would definitely violate federal law, but the Fourth Circuit, quite appropriately, applied yearsly to conclude that the contractor was immune from suit because it was following the government's instructions. So that's why I say it falls into the latter category. I'm following the government's instructions, and the government's instructions are lawful, so obviously everything I did was lawful, too. Isn't that the sort of rationale of yearsly? No, Your Honor, and this is an important point. My friends on the other side rewrite yearsly's first condition to say was it lawful. That has never been announced as the first yearsly condition, and it doesn't make any sense to say that you enjoy an immunity or even a defense or even a derivative privilege or whatever the SG's office has for us. That doesn't make any sense if what you've done complied with the law. The value of an immunity, and again the Cunningham decision to which I commend to the Court's attention, does a great job of analyzing this. It only does any work if the person could have been liable. So the government's instruction may have been violate the TCPA, consider Campbell Ewald, but change one of the facts. Suppose they had said, the Navy had said to the contractor, carpet bomb every 18 to 24-year-old in America with a text asking if they'd like to join the Navy. In that case, the contractor in Campbell Ewald wouldn't have had to make the argument that it was entitled to the government's absolute immunity. It would be able to argue that it was following the government's instructions and comes within years. But it wouldn't get the yearsly defense, though, because I thought the government would have to have the authority to issue the instructions, and to the extent the instructions violated the law, they wouldn't be authorized. Well, no. The question is, was it within Congress's power to authorize? And Congress — And it's not in Congress's — are you saying it is within Congress's power to instruct its contractors to do something unlawful? So the question — I want to be very precise about the language, Your Honor. The question in yearsly's first prong is whether what was done was within the constitutional power of Congress. Understood. Does Congress have the constitutional power, Congress, to authorize the government to direct its contractors to do something unlawful? That's a different — a slightly different, but importantly different question, so please indulge me on this. The question is, could Congress have done the thing? So could Congress have carpet-bombed all the 18- to 24-year-olds with a text? Definitely yes. It's a constitutional check. In other words, it's an anti-circumvention prong in the first prong of yearsly. Was what was done — we'll just keep using this example from Campbell-Yewald. What was done, texting everyone in America, was that within the constitutional power of Congress? Absolutely. The question is not, does Congress have the ability to do that, to authorize its contractors, for example. It was the underlying action within Congress's authority. You're skipping a big step. Yearsly was never an immunity case, not because it was after trial, but because the issue in Yearsly was who was responsible for the taking. And what we said is the agent was not responsible, it was the government. He was acting at the government's direction. The government can take, so sue the government. All right? That's what we said in Yearsly. The fact that we've inartfully called it an immunity, it's really a question of relief from liability. That's all Yearsly was about, was saying, you, the agent, is not liable, the principal is liable. So I don't know why the reliance on or even claiming this is an immunity defense. But putting that aside, you're taking a step further. You're taking what the Yearsly court said, it was, is the government, was what the government did lawful. Congress can pass a law that permits the government to send texts to 16-year-olds. But if it passes a law that says our military, no one can send a text, including our military, then I don't think that the military giving an order to its contractor to do it gives the contractor immunity. It may give it a defense to liability. I'm not sure what that defense would be, because Yearsly said you have to be following a lawful government order. But I, this is circular to me. I think what Your Honor is asking is, what if Congress passed something that was outside of its constitutional authority, like no one shall text anybody? If that was the instruction, say, to a satellite operator that was a government contractor, just jam all the texts, don't let people communicate or speak with each other, there would be a very good argument that that is outside of Congress's authority to authorize, because it can't shut down speech. Great. And we're back to Yearsly. Can the contractor, who should be responsible for that loss? But that's still a liability question, not an immunity. No, it's not. I mean, so throughout the history of this body of law, the Court has consistently emphasized that it's avoidance of suit, that it is an immunity from suit. And that is different, of course, than just avoiding liability. Now, the other side cites a number of times where the word liability appears in this Court and other Courts' decisions. So, for example, the Newman case, which is the New York subway case, and Sally Oat are two that we talk about in the papers. They excerpt the word liability, but liability is avoided by both a defense and an immunity. So that doesn't tell you enough. But if you look deeper at those cases, you can see, and I think it's page 28 of the reply brief, you can see why the reasoning is, in Newman, for example, the Court says, because the contractor stands in the shoes of the government, it has all of the immunities that come with being the government's, doing the government's work. And, in fact, Yearsley and Brady say that. They cite United States v. Linna to say the action of the contractor is the action of the government. Thank you, counsel. So, with that in mind, the operative question then becomes whether you have a collateral order that follows from this immunity. And in that regard, the Court's precedent is very helpful. Puerto Rico Aqueduct expressly says that it follows that you have a collateral order when an immunity from suit is at stake. Falarsky and other cases have teased out the purposes, including Mitchell, for which immunities exist. Why is the government on the other side from you then? I mean, that seems like a big hurdle, and it's been that way. Yes. Well, it's been that way lately. So, as I read the government's papers in this case, the reason that they're on that side is their legal conclusion about what's at stake. That is, whether it's an immunity or, as they have posited for the last eight years, but not before that, whether it is derivative privilege based on these sort of principal agency concepts. The government, to its credit, acknowledges that the impact on government operations, from exposing its contractors to massive liability, would be a significant obstacle. I think it's page 31 of their brief, and that Yearsley is critically important, page 3 of their brief. So, I think we're aligned as to part of the point, but I'm aware of the seating chart, and I think the explanation is that they have this rather creative argument based on principal agent concepts, which, in 1939 in Yearsley, they told the court that it was obvious as a matter of principle that contractors were immune. In Filarski, they said the same policy considerations apply. And then last week, in Hankley, it's page 10 of their amicus brief, they characterized Yearsley as barring suit. So, I think it's a break from where they've been in the past, and as a result, Wythe versus Levine was the same situation where the government had changed positions. It's also wrong on the merits. I mean, it proves too much and too little, as we point out in the reply brief. Too much in that... They say also that, I don't want to interrupt you there, but just so you can fold this in, they say there are other avenues for you for relief from this issue to be pursued. Yes, and I can fold that in, because it proves too much in that employees who get qualified immunity and officers who have their own immunity, absolute immunity, also could avail themselves of 1292. And one of the odd things about the government's position in this brief is that it carves out a new and special rule unique to federal contractors that they have to go through 1292B. Nobody else has to do that involved in the process. So, whereas in our case, you have GEO, for example, running a facility, and there are a number of ICE personnel. I think we have to provide 14 offices for ICE. There are two immigration courtrooms at this facility. Everybody involved, the ICE officials, the sovereign itself, are all immune and can all take a collateral order appeal, but the contractor, who is just doing what they're told, at least that's the presumption here under the second prong, is unable to appeal the denial of its immunity. So it creates a very odd loophole or gap in the operation of these programs. Can I just ask you, because it does seem to me that the core of this is how we characterize YEARSLY. Is it a defense or is it actually conferring immunity? What do we do with the fact that in YEARSLY itself the government had waived sovereign immunity? That's my understanding. And so to the extent that's the case, wouldn't we have a very odd scenario in which the contractor would somehow be given immunity but the government itself wouldn't, even though you say the contractor's immunity is derivative of the government's? This illustrates exactly the way it's supposed to work. So the sovereign waives its immunity in that case and accepts liability, as it must constitutionally for a taking, by the way, but then you sue the federal government. Our friends on the other side haven't sued the federal government in this case. The whole game here is suing contractors to try and thwart the government's policies. And so today it's a case about immigration detention. Tomorrow it could be Cunningham, in which the contractor was engaged in signing people up for subsidized insurance under the Affordable Care Act. If you name a government policy or program, it will rely on contractors, and I can find you somebody who would like to stymie the implementation of that program. So that is how we get back to the important interests at stake here. But to Your Honor's question, the government is free to waive its immunity all at once. The question, however, under the common law and the long common law tradition, is that when contractors are performing as directed, that they are immune. And that makes sense. I mean, you should actually want to focus litigation on the decision maker, which is the government. No, I understand. But you can do that by treating it as a defense. It's just odd to suggest that in a derivative sovereign immunity kind of – that there is derivative sovereign immunity in this kind of circumstance. I mean, yes, to the extent that the contractor is saying we were just following orders, the law provides an opportunity for them to defend themselves as a result of that, and I thought that's really the crux of what Yearsley is getting at. But as Justice Kagan said, that's a different concept than we should be liable, we are liable, but we are not going to be held liable because we have immunity. It is a different concept, Justice Jackson, and it's an importantly different concept because qualified immunity could be a defense. No, but it's an odd concept in a world in which the government has assumed liability in that same scenario. Sorry. Sometimes it has and sometimes it hasn't. In this case, the government has not waived its sovereign immunity as to the administration of these programs, which is why they've sued us. The government runs the exact same programs at its facilities. It's Section 5.8 of the PBNDS, which is the Voluntary Work Program. Congress appropriates exactly the stipend that GO pays. It's at PEDAP 141 and 144 is the disciplinary scale that comes from the government. It applies to their facilities too. So all of these decisions are made by the government, which is why I think Your Honor makes a good point that the suit should be directed against the government. That still gets back to the why is the government ‑‑ I guess I'm just stuck on this. You said this is across all sorts of government programs. I obviously agree. Why is the government then taking a position that you say will thwart the implementation operations of all these government programs? I'm just not seeing that. And because they're on the other side, it casts doubt on your assertion that all these programs are going to be ‑‑ obviously we're going to ask the government this too. I was going to suggest that you ask Dr. Joshi that question. And it is to some extent better directed to him. All I can say is that, you know, what's driving their brief, as far as I read it, is this reconceptualization of the long common law history and the idea that, in fact, what this Court and others have been doing, but never saying it, is applying some sort of derivative privilege born in the pages of the restatement and urged, by the way, on this Court in Campbell Ewald, and the Court didn't take the bait, urged on the Ninth Circuit in Childs, the 2022 decision, that Court didn't take the bait, repeated here in the CVSG brief in CACI from a few years ago. No one has embraced this thing, and it's not new. Well, it's somewhat new. It's eight years old. But before that, the government was consistently on the side of its contractors. And, again, beyond that, I just have to leave it to the government. You know, if the calculation is about the burden imposed on contractors, the government also doesn't really have a perspective on life as a private litigant. They don't have to hire outside counsel. But couldn't you negotiate for that in your contract with the government, that they cover your litigation expenses? No. I wish we could. So the Anti-Deficiency Act, of course, prevents us from having an open-ended indemnification. FAR 31.205 prevents any number of litigation costs from being built in. This is a fixed-price contract, as all of these are. Well, couldn't you fix that into the price of the contract? No, because the FARs exclude. It's a very fair question. The FARs exclude these litigation expenses. And if we were to put them in as sort of like overhead or something, that would be a false claim and would expose us to a suit under the False Claims Act. So, there again, although it is a real problem for jail and contract. I just want to make sure I understand what you're saying. You're saying you cannot price in litigation risk? Correct. We cannot price in at least not all litigation risk. It may be possible in some contracts, Your Honor. But as a general proposition, again, it's FAR Part 3, the Federal Acquisition Regulations, Part 31.205, that greatly restricts our ability to price that in. And as a result, you know, the government and GEO cite the Nawazar case in the Ninth Circuit where the State of Washington sought to impose its minimum wage law on GEO's Operation of the Voluntary Work Program. The Ninth Circuit said that was A-OK, cert petition coming. But the government in the meantime suspended, as Judge Bumate noted in his dissent from denial, suspended the Operation of the Voluntary Work Program at that facility. The point here is that it's not strictly monetary, Justice Barrett. This also goes to the operation of policy. That is the ICE determination, that having a voluntary work program that reduces idleness and encourages, you know, cooperation and reduces disciplinary incidents is a good penological policy, has been suspended at that facility exclusively because of the crushing liability that's coming for the contractors. Counsel, it seems to me like all the arguments you're making, I can see why you want them. And there's a lot of functional reasons why it might make sense, advanced government interest, et cetera. But should they be directed to Congress? Because at the end of the day, we're not being asked to decide whether you should have a defense to liability. We're asking whether this is within the collateral order doctrine, essentially, whether 1291 lets you have an immediate appeal. And so Congress could give you that. Yes, they could. Congress could have given employees an immediate appeal, the president an immediate appeal. So I take Your Honor's point. It is certainly possible. But again, this goes to, this is analogous to the 1292 argument that the government puts forward. It would be new ground and a new contractor-specific rule to say that some people who do the government's work and some people who are immune have to go through an additional step of obtaining statutory authorization. But we have certain statutory limits, and one of them is the finality rule. So you're asking us to make a judge-made immunity, which is an odd fit because sometimes the government has immunity or not. You don't care if the government has immunity. You're saying we have immunity, so we're creating a new sort of immunity. A judge-made exception to finality, after we've said which should be sparingly used. And a judge-made exception to Congress's legislation over immigration and government contracting. So you're asking us as judges to make three immunities, three new principles. Not at all, Your Honor. The court has already made the immunity in question. It stretches back to the cases that Yearsley cited, which, you know, Yearsley is 1940. We've always said the sovereign can't contract away its immunity. So it's either immunity or it's either a defense to liability. Not at all. So that is what we call the grand strawman. No one is asking for the government's embrace of immunity. Employees enjoy qualified immunity. That's not the government giving away its immunity. Qualified immunity is different, isn't it, in kind? Qualified immunity has different purposes than this. Not at all. So Filarski answers that question. Filarski says expressly that this serves, that immunity for contractors serves the identical purposes. That is to say, not dissuading good people from serving in government, avoiding timidity in the exercise of discretion. But it's not about individual officers in being shielded from undue interference with the performance of their duties in the way that qualified immunity works. I mean, you're just asking for a blanket no liability for contractors who are following the government's instructions. Qualified immunity is almost the opposite. It's like when you do something wrong, you are immunized if it's not clear to you that that principle exists in the law and that you are doing something wrong. This is the opposite of that, I think. No, I wish we got qualified immunity. Qualified immunity is much easier to satisfy because the question is, did you do something illegal or was it clearly illegal? Those conditions are more forgiving than the ones that Yersley gives to contractors. And believe me, I would love to have fit this within qualified immunity. Thank you, counsel. Justice Thomas. Justice Alito. Justice Kagan. Justice Jackson. Thank you, counsel. Thank you. Ms. Bennett. Mr. Chief Justice, and may it please the Court. To justify an expansion of the collateral order doctrine, GEO has to run the table. It must demonstrate that, as we just heard, Yersley is the rare defense that provides a right to avoid litigation entirely. That, two, immediate appeal serves a public interest so important that it overrides the final judgment rule. And, three, as a category, Yersley orders are completely separate from the merits. GEO fails on all three, each of which is an independent basis to affirm. First, on the right to avoid trial. Below and in its opening brief, GEO claimed that contractors that satisfy Yersley's requirements share the sovereign's immunity. It is now disavowed, that claim. I think that's correct. But that means that all GEO is left with is the claim that Yersley is qualified immunity for contractors. But qualified immunity is qualified immunity from contractors. What Filarski shows is that where history and policy support immunity from suit, those who work for the government get qualified immunity. Which means GEO's argument boils down to the claim that Yersley is an immunity from suit for contractors who can't show that history and policy warrant immunity. That doesn't make sense as a matter of common sense. It's also not what Yersley says or what the history of the defense that Yersley recognizes shows. Second, on effective unreviewability. GEO argues that immediate appeal of all Yersley orders, whether they apply to detention contractors or tree trimmers, is necessary to avoid burdening the government. But the government itself disagrees, and this Court held as much in will. And finally, on separateness from the merits. Unlike qualified immunity, Yersley cannot be granted without answering fact-intensive questions. What did the contractor do? What did the government direct? And what caused the plaintiff's injuries? So ordinarily, Yersley orders merely decide whether there's a sufficient factual dispute to send to the jury. Precisely what this Court in Johnson held cannot be immediately appealed. I welcome the Court's questions. If we agree with you, what approach should we take in disposing of this? So I think the most straightforward approach is to hold, you know, GEO's entire argument rests on this contention that Yersley is a right-to-avoid trial. I think it's clearly not. If you look at Yersley itself and if you look at the history, I think the most straightforward approach is to do that. But I think second would be to rule on the effective unreviewability prong. The sole interest that GEO is claiming here that supports a right to immediate appeal is the interest in avoiding the burdens of litigation to the government. That's precisely the interest that this Court held in Will v. Halleck isn't enough. In that case, you'll recall that's the case about the Federal Torts Claims Act's judgment bar. In that case, the defendants were government employees and it was a statute that said no action can be brought at all. So you have a statutory immunity from suit with a government employee defendant and this Court held that the burdens of litigation are not enough. So I'll take each of those. So first to start with the questions on the right to avoid suit that this Court was discussing with GEO's counsel. As I take it, they have essentially two arguments. One is this loose language argument. There's some language that we could interpret in cases that weren't dealing with this issue that suggests it's an immunity from suit. I'll note that none of those cases and, in fact, none of the briefs that GEO cites actually says that, except with one exception, which is the footnote in Nick. If you read the next sentence in the footnote in Nick, what it says is the Tucker Act provides a complete remedy so it excludes liability. So like Brady, Nick also makes clear what it means by immunity from suit. And, again, the Court wasn't dealing with that issue. And if this Court, you know, as this Court said in Digital Equipment, virtually every right that can be enforced on a motion to dismiss can be loosely called. And, in fact, I'll tell you has loosely been called an immunity from suit. If you look at statute of limitations, if you look at personal jurisdiction, if you look at Monell, which held that a local government may not be sued for an injury inflicted solely by its employees and agents. So that's the language may not be sued. Still in Swint, this Court held that government entities don't have a right to avoid trial under Monell. So over and over again, this Court has used this kind of loose language. But what the Court focuses on is what is the core of the actual right? Is this actually a right to avoid trial? And if you look at the cases that Earsley cites and that discuss this government authority defense, over and over again, when the Court is actually examining this defense, it says it's not a right to avoid trial. What about Campbell-Ewald? So Campbell-Ewald, I think, didn't answer this question. It didn't need to. It was after final judgment. The contractor there said, there's this thing called derivative sovereign immunity, which I'll note Campbell-Ewald puts in scare quotes throughout the opinion. There's this thing called derivative sovereign immunity, and we get it. And what Campbell-Ewald said is, well, there's nothing to support your claim that there is this thing called derivative sovereign immunity. And in any event, everybody agrees that whatever it is, it would have these two requirements. And it said, at this stage, we can't determine that those, both of those requirements are met. And so I don't know that this Court, this Court didn't actually have to decide the right to avoid trial versus immunity from suit issue. When it did look at that issue, so for example, Hopkins v. Clemson, what it says, and this is a quote, agents acting for the state, though not exempt from suit, could successfully defend by exhibiting the lawful authority under which they acted. Murray's lessee distinguishes the immunity from suit for the United States. Murray's lessee, though no suit can be brought against the United States, it says a suit may be brought against a marshal to determine, to provide its lawful authority. Brady, again, says, in broadening the government's use of contractors, so Brady considered essentially this argument, which was the government is using contractors all the time now. Shouldn't they be treated like employees of the government? And what Brady says is, in broadening the use of contractors, quote, immunity from suit is not favored. And what Brady says is, it would require not only a grant from Congress, but a grant in unambiguous terms. And there are numerous other cases. United States v. California says the same thing. So then, I think. But GEO is doing exactly what government officials can do and generally have done, running facilities like this. So imagine you had brought these claims against ICE and specific ICE officials. ICE and the officials could raise sovereign immunity. They could raise qualified immunity and Westfall Act immunity. And if the district court denied any of those, then they could get an interlocutory appeal. So why shouldn't the rule be the same for GEO? Don't the considerations that justify interlocutory appeal when the suit is against a government official also justify an interlocutory appeal here? I think it depends on the basis for the suit and particularly on the basis for the defense. So the reason that an ICE employee, and I'll note this court has never held that qualified immunity is a defense to forced labor claims, statutory forced labor claims. But I'll bracket that. Assume that ICE employees could get qualified immunity or could assert it. The reason they can do that is what this court has said is that the history and the policy support an immunity from suit. And so if the history and policy support an immunity from suit, then you'll get qualified immunity. All right. How about the policy? Why isn't the policy the same, policy considerations the same here? Sure. So what Filarski and what Mitchell say are the policy considerations that specifically justify the immunity from suit is the consideration of wanting government employees to show initiative in the face of unclear law. That is why you would get qualified immunity. That is not why you get yearsly. Yearsly, in fact, is precisely the opposite of that. Yearsly only applies when you're doing exactly what the government directed, and it doesn't matter whether it's clearly established or not. Yearsly isn't about saying, contractors, we want you to go out and take bold action, regardless of whether you know it's lawful, regardless of whether you've been directed by the government. And so the ‑‑ Well, it's not really. The justification for qualified immunity is not just that you want government officials to be able to take bold action. It's that you don't want them to be ‑‑ to have to bear the burdens of litigation, which can be quite substantial, when it may well be that they didn't do, and they didn't do anything that was unjustified based on what they knew. So why doesn't that apply just as well here, those policy considerations? Why don't they apply just as well here? Sure. So I want to distinguish between the policy considerations that underlie a potential defense, like qualified immunity. Those considerations go to the existence of the defense. What Mitchell said is the key to qualified immunity that justifies an immediate appeal is this need to show initiative. And that's just not at issue in Yearsly. And we know that not all government defenses are immediately appealable. Not everything that's going to put a litigation burden on somebody who works with the government is immediately appealable. We know that from Will v. Halleck, the FTCA judgment bar claim. We know that from Swint, which held that Monel claims when a local government is ‑‑ when a plaintiff is trying to hold a local government liable for just the acts of its employees when they haven't satisfied Monel, Swint says no immediate appeal. And that is the government itself. McDonald reaffirms an old Supreme Court case about immunity from prosecution for people who have testified on behalf of the government. The public authority defense in the criminal context, which this Court mentioned in the Trump case, that also ‑‑ that's a defense for people who work with the government. And this Court said it's not an immunity from suit. It's a defense. And it's not immediately appealable. And so when we're talking about just the general cost to the government, what we're talking about is something that this Court over and over again has said does not justify an immediate appeal. You need something special. And I'm happy to talk more about that, but I also want to flag that everything we're talking about now is policy. And, you know, the ‑‑ and policy based on empirical questions. How much is this going to cost the government, if anything? What is the impact going to be? We have the government here telling us that the impact doesn't justify an immediate appeal, but if this Court thinks that those kinds of considerations might do so, then the proper avenue for considering them is rulemaking, where you can get expertise from the bench and from the bar to explain, you know, these empirical questions, to discuss the policy considerations. Because, you know, here you have a case in a ‑‑ Well, I mean, policy is a dirty word, but isn't something similar to policy what is going on in Mitchell and in the other cases where we have said there's a right not to trial unless a certain requirement is met? I absolutely agree with that, Your Honor. And Mitchell was before Congress passed a statute enabling the Court to create new categories of interlocutory orders through rulemaking and interpret the final decision rule through rulemaking. And what this Court has said in Swint, what it said in Mohawk, what it said recently in Microsoft, is that now is the proper venue for answering this kind of question. Unless we've previously said that something is a collateral order, if we're going back and forth about empirical questions and policy questions, rulemaking is the proper venue for doing that. And then I'd like to just briefly address the idea, the completely separate from the merits prong. You know, again, what this Court held in Mitchell is that the thing that makes qualified immunity collateral is that this clearly established law question. And that question is a purely question of law. And we know from Johnson that where you don't have that pure question of law, where you have a question that is, is there a sufficient dispute of fact to send to the jury, you don't get an immediate appeal. And the way, and I think Geo's argument on this point, as I understand it, is Mitchell held that any time you can answer any questions on given facts, that's sufficient. But that can't be the case. That would mean any order on a motion to dismiss, any order on a motion for summary judgment, the issue in Johnson itself would have been immediately appealable. And we know that's not correct. What makes qualified immunity different is the question, you have to look at given facts to figure out what right is the plaintiff saying is violated here. But the fundamental question is interpreting circuit and Supreme Court precedent to figure out whether a legal right was established at a particular time. That's the ordinary thing appellate courts do every day. Here, there is no equivalent on which Yearsley can be granted to this just interpret appellate and Supreme Court precedent. Yearsley, to get the Yearsley defense, a contractor always has to satisfy the second universe of facts, which is what the government directed, which I'll note is not just in the contract often, but is in handbooks, it can be in e-mails, it can be verbal, there can be deposition testimony. Why does that question have to be answered in the context of Yearsley? In other words, your friend on the other side suggested that the Yearsley defense is just, or at least one prong of it, is not really about whether this conduct is actually lawful or whether or not, you know, this comports with the law, but just whether Congress had the constitutional ability to authorize it. Sure. So I'll answer that question, but just to flag, GEO's argument on that, whether it's right or not, is just to the first prong. And so you'll still always have the second prong, which is what did the government direct the conduct that caused the plaintiff's injury. So in order to get Yearsley, you'll always have to answer this fact-bound question that's often going to be intertwined with the merits. But to answer your question directly, the reason Yearsley says was this within Congress's authority is because Yearsley involved a statute. The work that was being done by the contractor in Yearsley was directed by statute by Congress, and so to determine whether the government had authority to direct the contractor to do that, you're looking at Congress's authority. I am aware of no case that suggests that a contracting officer in an agency somewhere could authorize a contractor to violate Federal law, and that would be validly conferred authority. And I think, you know, the cases, I think, show otherwise. You know, Yearsley itself, the reason it looks at whether the government provided a remedy for the taking was to determine whether the authority was validly conferred. And just to address the idea of agency principles where this comes from, you know, I take Geo's argument to be, well, these cases don't use the word privilege. That's true. Most of them don't. But the restatement says privilege. What it's saying is a validly conferred authority. That's just the restatement's word for that kind of authority, whether the principal had the lawful authority to do something that would otherwise violate the law and had the authority to confer that. And you can see that throughout this Court's cases, starting with Yearsley. You know, Yearsley itself couches its rule in terms of agency, and there's no dispute that the principles it applies are longstanding agency principles. In fact, Geo's opening brief says, Yearsley reflects settled agency principles. That's page 16 to 17. And this is most clear, I think, in Larson, where this Court summarizes its jurisprudence on this. And I'll just read you a little bit of Larson. It says, the principle that an agent is liable for his own torts is an ancient one. It applies even to government actors. And then it says, if the actions of a government officer do not conflict with the terms of his valid statutory authority, then they are the actions of the government if they would be the actions of a private principal. So Larson is saying, you know, when an agent takes – a government agent takes an action, what you look to is traditional agency law principal agent to figure out whether that's the act of the government. And then it also says, even if the action is the act of the government, the government agent is still liable if his action is such that a liability would be imposed by the general law of torts. In other words, we're looking at the general principles of torts, which include agency, of course, to figure out when is the government agent liable. That's what this Court said in Larson. And that principle, that ordinary principle from the restatement from Larson, from Yearsley, from Brady, that ordinary principle is, if the principal has authority and validly delegates it, the agent is not liable for complying with directions. And because it comes from agency, that's one way you know that it's an ordinary defense. You know, this Court in Will v. Halleck said, this judgment bar, it's not exactly one-to-one with ordinary preclusion principles, but that's basically where it comes from. And we know preclusion is – you know, we're not going to give an immediate appeal to something like preclusion. The same is true here. We don't ordinarily give an immediate appeal on the defense that my principal told me I could do this. And there's no reason to do so in this context.  Thank you, counsel. Justice Thomas. Justice Alito. Thank you, counsel. Mr. Joshi. Thank you, Mr. Chief Justice, and may it please the Court. It sounds like the Court has a pretty good handle on the issue, so why don't I just start by addressing why are we on this side of the lectern instead of the other. You know, the bottom line is that we just look at Yearsley and everything that I think we said in our brief there. We said a suit can't be maintained. We're talking about liability. We look at Yearsley. We do think it's a rule about liability and a defense to liability, and then we're just trying to be faithful agents of this Court's collateral order jurisprudence, which suggests that when you have a standard defense to liability, even if it's important, even if it would mean that you have to suffer through a trial that had the motion to dismiss been granted, you wouldn't have had to suffer through. That is still not the kind of order that is immediately appealable as a final decision under Section 1291. And to be clear, we agree with Petitioner that the defense is critical to our efforts, and a lot of what Petitioner says in its briefs and a lot of what its amici say about the cost of liability and what that can do to the amount the government has to pay for services. We agree with that completely. We do think this is a really important defense, and if the defense were up here, we might well be on the other side of the lectern. But the only question here, as Justice Barrett indicated, was just the collateral order question, and there we think the right answer under this Court's case law is that it is just like a denial of any other motion to dismiss on the merits. It's not immediately appealable. You have to wait until final judgment.  You should never over – oh, I'm sorry. No, no. No, please. I was simply going to ask the question I asked earlier. What's your preferred method of disposing of this? We think the right way to dispose of it is largely what my friend said for respondents, which is that because Yearsley reflects a defense to liability and not an immunity from even standing the burdens of trial, that it doesn't satisfy the third Cohen condition if you want to look at it doctrinally like that, and that's the most straightforward way to proceed. I was just going to ask, you know, we know that this is a defense from liability as opposed to a true immunity. Because why? Because we view Yearsley through the principal agency concepts in which we do think it's a privilege that's being delegated, but we really think if you look at the substance of what's being delegated, it means that the contractor acts lawfully when it obeys lawfully delegated instructions from the government. And we agree with respondents and what my friend said earlier, which is that an agency doesn't have – like a Federal agency doesn't have authority to violate a Federal statute, for example. That's just not something an agency is allowed to do. So I don't think Petitioner is correct to say that the first condition of Yearsley is just whether it's within Congress's constitutional power. Of course, Congress could pass a different statute, but it hasn't. It has passed a certain statute, and an agency is not free to violate it. And I don't think the agency is free to effectually violate the statute by simply contracting a private party to do it for the agency. That doesn't really make much sense. So we think where Yearsley applies – well, sorry. We think the first condition of Yearsley is really about lawfulness. Is it – can the government – could the government lawfully do it? And then second, did the government lawfully delegate that privilege to the agent? And that's why we think there's really no gap between successfully showing entitlement to the Yearsley defense and having acted lawfully. We think those Venn diagrams are just circles on top of each other. Mr. Joshi, is it true that a contractor can't price in litigation risk or seek indemnification for litigation expenses? Yeah. We don't think that's quite true for a number of reasons. Number one, we do think they can – to the extent they have litigation costs in the background, they have their own in-house counsel, things like that, those do go into sort of overhead costs. And I think most contractors, with all of their overheads, will, to a certain degree, price that into their bids, into the contract, and that's generally considered okay. Also considered okay under the FAR is insurance against litigation costs. Those can be a line item in, say, a cost-plus contract. That could be validly put into a bid and the government could validly pay it. As far as indemnity goes, OLC has long taken the position that indemnity clauses are acceptable as long as, number one, they are capped, and number two, they are conditioned expressly in the contract as being contingent on there being appropriated funds available at the time the payment is due. So as long as those conditions are satisfied in the contract, even indemnity is okay. Now, I know that Petitioner in the reply was – On your first point, you mentioned – your friend on the other side mentioned the False Claims Act. That's not a concern? I'm not entirely sure why it would be a False Claims Act violation to say in a contract, here are our overhead costs and, government, you can accept our bid or not. Okay. Well, I'm sure that will be used in the future. Well, I'm just not sure what Mr. Dray is referring to, to be honest. You know, in my own discussions with my client agencies, I've been told that these kinds of overhead costs typically are just reflective of background costs, and so presumably GEO might be competing with CoreCivic, might be competing with others, and presumably if there were large litigation costs, as a result of not having an interlocutory, or I shouldn't use the word interlocutory, but not having an immediate collateral order appeal, that would be the delta, presumably. I guess that would just be priced into the contract. We don't see a hesitance on the part of either Petitioner or CoreCivic or other private contractors in bidding on contracts in circuits, including the Ninth, which is a pretty large circuit, that don't find this to be a collateral order subject to immediate appeal. As we know, to the extent you're thinking, well, maybe it is an immunity from suit, then you would have to answer the question from Will against Halleck, is this important enough to warrant an immediate appeal? Is this more like in digital equipment, in Loro lines, in high key? You know, in other cases, you would have to ask, you know, is this right being under-enforced, was the word Mohawk used? Are district courts getting it wrong a lot? We don't see evidence of that either. All the cases that Petitioner cites on its side of the split have ultimately heard the interlocutory appeal and then ruled against the defendant there. So we just don't see it empirically as a large problem. It seems intuitively to me, and I'll stop here, so I won't have any questions on the Robin. But intuitively, the simple answer was the second answer your co-counsel gave, which was this is a category or cases that are factually interwound often. What was the question? What order did the government give or not give? So isn't that an easy out? I would love to say yes, and my only hesitance is that I really do think that the case to a large degree depends on whether you view yearsly as an immunity from standing the burdens of trial, an immunity from suit, because if it is, then I have to admit, notwithstanding the courts like literal text in Cooper's and Librand and all the other cases, the fact is sovereign immunity, absolute immunity, and to a certain degree qualified immunity all involved issues intertwined with the merits, and nevertheless, they're deemed collateral orders. Thank you, counsel. Thank you, counsel. Rebuttal, Mr. Dre. Thank you. A few quick points on rebuttal. I'd actually like to pick up where Justice Sotomayor just left off on the fact intensity red herring. Yearsly is exactly like qualified immunity. As Johnson explains, if there's a fact question, then you don't qualify for the immunity. That's exactly the same thing here. So it's contract interpretation. In this very case, the district court not only denied our motion for summary judgment, but granted the other side's on yearsly, whether it be a defense or an immunity. So clearly, there are no open fact questions in this case. You consider the facts given in the complaint, the relevant contract, and governing regulations. No need for a fact intensive inquiry. As for the claims about history and function, here again, this isn't loose language. The court doesn't just say immunity in passing. It talks about since Lamar v. Brown, it explains that contractors are not liable to suit. It is clear from the court's reasoning, and Professor Volokh does a great job explaining this in his amicus brief, that this has always been an immunity from suit precisely because you're doing the government's work. And all the way through three circuits, the third, fourth, and fifth, have all said that since 2018 in cases that we cite in the papers. As to the idea about other workarounds, like including things in the contract, please note that Dr. Joshi mentions only in-house counsel and insurance. Those might be eligible under the FARS, but all the other stuff isn't. And we're not just talking about in-house counsel. I don't work in-house at GEO. Additionally, there are lots of small contractors and specialists who work as contractors for the federal government, who can't contract this in, but who will have, and this gets to my last point, the initiative problem of whether or not they should continue to work for the federal government or do other better things with their time. That's why at the end of the day, what the SG and respondents ask the court to do is to carve out a special rule in exclusion for contractors. But based on history and function, contractors fit neatly within this court's collateral order jurisprudence. The initiative point is a good example. There are many ways in which a contractor can act, as Campbell Ewald said, quote, in compliance with all federal directions, end quote. Think of the Taylor Energy case devising a solution for an oil spill. Contractors need to exercise their discretion without timidity and without considering lawsuits as well. So the factors, excuse me, the functional analysis applies just as strongly, and Filarski takes care of this point as the history does. So with that, the only alternative from the other side, again, is a carve-out that's idiosyncratic to contractors. There's just no reason to deny the immediate appeal to contractors that's available to the government that they serve or the government employees with whom they work side by side. Thank you. Thank you, counsel. The case is submitted.